SOMERS L. DOUGHTY, complainant-respondent,

*v.*

ISABEL DOBBIN, defendant-appellant.

[Argued May 22d, 1931. Decided February 1st, 1932.]

514

*Mr. Paul M. Salsburg (Mr. Merritt Lane,* of counsel), for the appellant.

*Mr. John C. Reed (Mr. Emerson L. Richards,* of counsel), for the respondent.

The opinion of the court was delivered by

HETFIELD, J.

The complainant filed two bills, seeking an accounting for money advanced by him to the defendant, for the purpose of improving certain properties to which she held title, and prays that an equitable lien be impressed on said properties, to the extent of the amount so advanced. The two cases were heard by the vice-chancellor, and argued before this court together, and will be so considered.

It appears that the complainant married the defendant's mother, in 1914, at which time the defendant was seventeen years of age. The mother died about four years after the marriage, and the defendant continued to live with her stepfather, until February 6th, 1929, at which time she married one Joseph S. Naame. It is apparent that the complainant was very fond of his stepdaughter, and gave her, from time to time, not only money, but considerable real estate. The property involved in the first bill of complaint, consisted of two adjoining tracts, which it is admitted, were given to the stepdaughter by the complainant. The first tract was conveyed by him December 20th, 1922, and was situated on the corner of New Jersey and Baltic avenues, Atlantic City. The buildings on this property consisted of a saloon and two living apartments. The second tract was a vacant lot, adjoining the first, and was conveyed by complainant September 19th, 1925. The property involved in the second bill of complaint was situated on North Ohio avenue, Atlantic City, and had located thereon five dwellings, which were of no value, being in an old and dilapidated condition, and were subse-

quently demolished. This tract was conveyed to complainant by deed of the Guarantee Trust Company, dated March 19th, 1927, and on the same day, the complainant transferred the premises to the defendant. The consideration received by the trust company was $30,000, which was satisfied by the complainant executing a purchase-money mortgage for $15,000, and paying the balance in cash, of which the complainant alleged he furnished $7,500, and the defendant a like amount. The defendant claimed she had no recollection of the complainant contributing to any part of the cash paid. However, whether he did or not, is immaterial, for the reason that complainant states it was his intention and purpose to give his stepdaughter all his interest in this property, including the $7,500 paid by him, and that she was to assume the $15,000 mortgage.

The two tracts of land situated on New Jersey and Baltic avenues were improved by the erection of apartment houses on the vacant lot, and remodeling the old buildings on the corner, so that they could be used for a similar purpose, the apartments being known as "The Savoy." This building contract was made in the name of complainant. There was also erected on the North Ohio avenue property, subsequent to its being conveyed to the defendant, an apartment house which was known as the "Ohio Apartments." The plans and other papers in connection therewith, were made in the name of the defendant. It would appear that all of these improvements were financed with money furnished by the complainant, and by the proceeds from mortgages placed on the Savoy and adjoining property, as well as rents received by the defendant from her apartments.

The complainant contends that while the land he conveyed to defendant was a gift, it was understood and agreed that any and all money he advanced for the improvements, was to be repaid him by the placing of mortgages on all properties and from rents received, and alleges that there is now due him from the defendant, by reason of such advancements, a balance of approximately $157,000, which represents

$44,000 due him in reference to the Savoy improvements, and the sum of $104,000 concerning the Ohio apartments. Another item of $8,000 he claims, is a balance due on a note made by defendant, which he had taken out of the bank, having guaranteed the payment of same, the proceeds of this note being used to pay a mortgage given on the corner property adjoining the Savoy, at the time the buildings were being remodeled, and in addition to this note, complainant alleges to have advanced $1,000 for that work. The complainant further alleges, that pursuant to the understanding and agreement he had with defendant, she placed three mortgages on the Savoy and corner properties, and paid the proceeds, aggregating approximately $91,895.73, to him, and that defendant had also given him a $500 check to be credited on the advancements he made on both the Savoy and Ohio apartments. The complainant further alleges that defendant now refuses to make any further payment on account, or to permit a mortgage of $75,000 to be placed on the Ohio apartments which are free from all liens, as she agreed to do when he advanced the money for that improvement, so that he could receive the proceeds therefrom to reimburse him in part for the amount expended.

The defendant admits that the complainant furnished money on different occasions during the time the improvements were being made on her properties, but denies that such contributions were loans, or that same were to be repaid, and claims that it was the complainant's intention that all payments of this character were to be gifts, with the exception of the $8,000 item, representing the balance due on her note which complainant had guaranteed. She also denies that any mortgages were procured as the result of an agreement, or that the proceeds therefrom were paid to complainant on account of the money advanced, but admits that same were used for the improvement of the properties. She also denies that any agreement was ever made by her to place a $75,000 mortgage on the Ohio apartments.

The learned vice-chancellor concluded that the proof sub-

mitted by complainant was sufficient to overcome the presumption that the different payments made by him were gifts, and stated as a reason therefor, that complainant had received the proceeds of all the mortgages and credited same on account of the money so advanced by him; and that defendant had not given the court the true facts in respect to the check for $500 which she gave complainant, drawn on the bank account of the "Ohio Apartments," and on the face of which appeared "for account of Savoy and Ohio Apartments to Somers Doughty—principal." The complainant was granted, in both cases, the relief prayed for, and decrees were entered accordingly, from which the present appeals are taken.

While the evidence is conflicting, it seems to clearly indicate that the general purpose and intent of complainant, and so understood by defendant, was to provide for her so that she might have a comfortable income in years to come, and he accordingly gave her the land and such money as was needed, in addition to that which she received from the proceeds of mortgages and rents, to finance the improvements. The relations between the complainant and his stepdaughter, from the time of his marriage, to the latter part of 1928, appear to have been of such character as usually exists between parent and child; and subsequent to the mother's death, to the time of defendant's marriage, they constituted the entire household, with the exception of the colored maid. There is no proof to contradict the fact that complainant stood *in loco parentis,* and as this relation existed, the presumption is, that the money advanced was intended as a gift, subject, however, to be overcome by evidence disclosing a contrary intention. There is no intimation that defendant was the dominant party, or of any undue influence, and no evidence is submitted or contention made, that the complainant did not appreciate the consequence to himself when making the gifts, and therefore, the doctrine of independent advice need not be considered. It appears that the complainant was a person of considerable wealth, having testi-

fied that he hoped his holdings were more than $100,000, but did not think he was worth $500,000, so that his action in assisting the defendant cannot be considered as improvident; consequently, the only question involved is one of fact, as to whether the money furnished was intended to be a gift. There does not seem to have been any differences or dissension between the parties, until the late fall of 1928, when the defendant became interested in one Joseph S. Naame, who was the contractor employed to erect the improvements on the several properties, and whom she subsequently married. The complainant was much opposed to the marriage, and did everything within his power to prevent it. He conceived a violent dislike for Naame, and assaulted him on two different occasions. He told both Naame and the defendant, that if they continued their relations, he would take away everything he had given to the defendant. When it appeared that his threats were of no avail, he became vindicative, and apparently determined to do the defendant all the harm possible. He admits that he did not request the defendant to execute a mortgage of $75,000 on the Ohio apartments, until November, 1928, which was after she had become intimate with Naame, although said apartments were completed sometime in the forepart of November, 1927, so it would seem that if any such agreement existed as alleged, he would not have waited a year for the fulfillment of same. The time and manner of his instituting the present suits shows the animus of complainant better than words, the papers having been served on the defendant about an hour before the marriage ceremony. The proofs do not seem to warrant the conclusion of the court of chancery, to the effect that the proceeds of all the mortgages were paid to complainant on account, and so credited. The proceeds of the $25,000 mortgage, obtained from the Trident Building and Loan Association, in July, 1927, it seems, were paid by the defendant to complainant, on July 20th, 1927, to be used by him in some stock transactions, and it appears that six days after, complainant paid back the amount advanced by the stepdaughter,

together with the sum of $374.50, representing rents he collected from her apartments. The complainant admits that he did not receive the proceeds of the $35,000 mortgage obtained October 15th, 1927, from the Atlantic City Building and Loan Association, as his testimony reads as follows:

"*Q*. Was that the $35,000 loan on 713 and 15 Baltic avenue? *A*. Yes, sir. $35,000 loan, got $33,826.75; that money went to help pay the balance of the Ohio Apartment. *Q*. Now, a while ago, of course, you told me that you had been paid down to within $40,000—— *A*. Forty some thousand. *Q*. ——By means of these various mortgages, but, as a matter of fact, while you were so paid, you never actually did get the proceeds of this $35,000 mortgage, did you? *A*. No, sir. *Q*. Now, what did you do with that money? *A*. I let her keep that money to go on to pay Naame, for building the Ohio Apartments and credited her with that, but didn't want her to give it to me, but just let her to use it to put it to her bank account. *Q*. So far as you know she paid Naame up to the amount of the proceeds of this mortgage, isn't that the fact? *A*. As far as I know."

The check for $500, which was given to complainant by defendant, on December 15th, 1928, and referred to in the conclusions of the court of chancery, is relied upon to a great extent by complainant, to support his version of the transactions with the defendant. He claims that this payment·was made on account· of the principal due on loans to the defendant, as indicated on the check, and also that same was given to him after repeated requests for some payment on defendant's indebtedness to him, and that defendant left the check with the maid, who handed it to him. Defendant testified as to the circumstances under which the check was given, as follows:

"The morning that I gave him this check he nagged me and fought with me about Mr. Doughty from breakfast time until I finished dressing, followed me from room to room in a terrible temper, I was afraid of my life, he said if I was a man he would knock me down, then in the heat of anger

he said, 'You still owe me money for the furniture.' He said, 'You still owe money. Can I have a check?' I said, 'Well, if that is the way you feel about it, how much do you want?' He said, 'I will take five hundred dollars,' so I was so excited I said, 'come on downstairs.' He followed me downstairs and stood over me while I wrote this check and made me write on there, 'Ohio and Savoy Apartments to Somers Doughty, principal,' and grabbed the check out of my hands, grabbed out of my hand, and came back later on very much calmed down, and laughed at me, 'Now I have got you. I will get everything I ever gave you. I will take it back from you if you marry Joe Naame.' I said, 'I don't see how you can do that.' He·said, 'I have got the evidence; you only borrowed my money; that is the evidence I wanted to get and you did it for me.' Several days after that he came to the Ohio Apartments and threatened to kill Mr. Naame with the club. The following week he followed me to the Savoy Apartments and threatened to kill Mr. Naame again and hit him on the jaw and broke his own knuckles."

Complainant had photographic copies made of said check before cashing it; and we are inclined to believe that he induced the defendant to issue same in the form presented, for the purpose of using it to further his cause, and do not think it should influence this court in arriving at its conclusions. The complainant produced no other documentary evidence, in the way of books of account or records, to prove that the advancements made were business transactions, and the evidence offered in his behalf, does not support his contention to the degree required by the courts of this state. It is true that the testimony of the colored maid, Maude St. John, who has been a domestic in the complainant's household for the past eight years, tends to support complainant's case, but her hostility toward the defendant is so apparent, that it destroys her credibility. The evidence of the defendant and her witnesses presents a situation that is much more probable than the one attempted to be proved by the complainant.

In the case of *James* v. *Aller, 68 N. J. Eq. 666,* where

the complainant endeavored to annul certain gifts of real and personal property made to his children, the present chief-justice, speaking for this court, stated: "The respondent in the prime of life, as has already been stated, in the full possession of his faculties, as the case shows, and without the exercise of any influence over him by his children, made this gift to them. At that time no conditions existed to justify the conclusion that the original relation existing between parent and child [*i. e.,* a relation where the parent occupies the dominant position] has been reversed, and that the children then occupied that position. His purpose, at the time of making the gift, was to make them the absolute owners of the property donated. It was his to dispose of as he saw fit. The gift was intended by him to be, and was, irrevocable. That being so, he has no legal right to now require the return of the property with which he then parted."

It is natural that a father should provide for his daughter, as the paternal feelings of a good man prompt him to do so; and when a gift is made under such circumstances, the law presumes such act, in all respects, proper and just, until the contrary is made to appear. The burden is on him who alleges the contrary to prove it, and the proof must be convincing, leaving no reasonable doubt as to the intention of the donor. However, where the parties stand in confidential relation to each other, a gift from the weaker to the dominant party is presumed to result from undue influence; and therefore, where facts are shown, other than the mere relation of parent and child, establishing between the parties a confidential relation in which the child is the dominant party, a gift from the parent to such child is presumed to be tainted with undue influence and the burden is upon the child to show the *bona fides* of the transaction. In the present case, there is no intimation of undue influence, and it is clear that the proofs offered on behalf of the complainant are insufficient to rebut the presumption of gift.

We therefore conclude that both decrees must be reversed, and the bills dismissed.

522

No. 66—

*For affirmance*—None.

*For reversal*—The Chief-Justice, Trenchard, Parker, Campbell, Lloyd, Case, Bodine, Daly, Donges, Van Buskirk, Hetfield, Dear, Wells, JJ. 13.

No. 67—

*For affirmance*—None.

*For reversal*—The Chief-Justice, Trenchard, Parker, Campbell, Lloyd, Case, Bodine, Daly, Donges, Van Buskirk, Hetfield, Wells, JJ. 12.